UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE INTERNATIONAL CHURCH OF THE FOURSQUARE GOSPEL,<br><br>Plaintiff,<br><br>v.<br><br>PG&E CORPORATION,<br><br>Defendant. | Case No. 20-cv-04569-HSG<br><br>**ORDER GRANTING MOTION TO DISMISS APPEAL**<br><br>Re: Dkt. No. 4 |

Pending before the Court is PG&E Corporation ("PG&E Corp.") and Pacific Gas and Electric Company ("Utility"), as debtors (collectively, the "Debtors," and as reorganized pursuant to the Plan (as defined below), "Reorganized Debtors") motion to dismiss ("Motion") this appeal by International Church of the Foresquare Gospel and certain wildfire victims ("Appellant"). Dkt. No. 4. Appellant filed this appeal of the Bankruptcy Court's order ("Confirmation Order") confirming the Debtors' Plan of Reorganization dated June 19, 2020 ("Plan").[1]  For the reasons set forth below, the Court **GRANTS** the Motion.[2]

I. **BACKGROUND**

On January 29, 2019, the Debtors commenced voluntary cases for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California ("Bankruptcy Court"). Significantly, the Debtors needed to propose a plan of reorganization that satisfied the requirements of A.B. 1054, including its June 30, 2020 deadline for plan confirmation. In light of the "increased risk of catastrophic wildfires,"

---

[1] Capitalized terms not otherwise defined in this order have the meanings ascribed to them in the Plan.
[2] The Court finds this matter appropriate for disposition without oral argument, and the matter is deemed submitted.  *See* Civil L.R. 7-1(b).

1   A.B. 1054 created the "Go-Forward Wildfire Fund" as a multi-billion dollar safety net to
2   compensate future victims of public utility fires and thereby "reduce the costs to ratepayers in
3   addressing utility-caused catastrophic wildfires," support "the credit worthiness of electrical
4   corporations," like the Debtors, and provide "a mechanism to attract capital for investment in safe,
5   clean, and reliable power for California at a reasonable cost to ratepayers." A.B. 1054 § 1(a). For
6   the Debtors to qualify for the Go-Forward Wildfire Fund, however, A.B. 1054 required, among
7   other things, the Debtors to obtain an order from the Bankruptcy Court confirming a plan of
8   reorganization by June 30, 2020. *See* A.B. 1054 § 16, ch. 3, 3292(b).

The settlement embodied in the Subrogation Claims RSA, for instance, was critical to confirming a plan by the June 30, 2020 A.B. 1054 deadline. The Subrogation Claims RSA allowed the Debtors to settle and resolve Subrogation Claims of over $20 billion in alleged liabilities for approximately $11 billion. Mot. at 3. A fundamental requirement of this settlement, however, was that the order confirming a plan for the Debtors include a "Made Whole Release Provision" that Appellants now seek to eliminate through this appeal. In connection with that settlement, and the allowance of the Subrogation Wildfire Claims in the reduced amount, the Debtors agreed to fund an $11 billion trust under the Plan ("Subrogation Wildfire Trust") that would administer, process, satisfy, and resolve all Subrogation Fire Claims following the Effective Date. *See* Plan, §§ 4.6(a), 4.25(e), 6.4–6.6.

The Subrogation Claims RSA and consensual reduction of the potential magnitude of the Subrogation Wildfire Claims enabled the Debtors to reach an agreement with the Tort Claimants Committee, which was critical to advancing the Plan that fully resolved and discharged the claims of Fire Victims. Under the Tort Claimants RSA, the Debtors agreed to fund a trust with approximately $13.5 billion of cash and stock, plus certain assigned causes of action ("Fire Victim Trust") that would assume all liability for and process, administer, and otherwise settle, discharge, and resolve all Fire Victim Claims. *See* Plan, §§ 6.7, 10.7.

The Debtors also successfully achieved the following settlements ("Settlements"): (i) the Public Entities Support Agreements, which resolved the wildfire claims of 18 local public entities for approximately $1 billion; (ii) the Noteholder RSA, which resolved outstanding disputes with

2

the Ad Hoc Noteholder Committee representing holders of billions of dollars in note claims over, among other things, the payment of make-whole premiums and the appropriate rate of postpetition interest to be paid on unsecured claims under the Plan; (iii) the Tubbs Settlements, which liquidated and allowed the Fire Claims of certain elderly or infirm individual plaintiffs for whom the Bankruptcy Court granted relief from the automatic stay to pursue their claims relating to the Tubbs fire; (iv) the Butte County DA Settlement, pursuant to which the Debtors agreed to plead guilty to certain charges and pay a fine of approximately $4 million to fully resolve the criminal prosecution of the Debtors arising out of the 2018 Camp Fire; (v) the Federal Agency Claims Settlement and the State Agency Claims Settlements, which resolved the treatment of approximately $7.5 billion in Fire Claims that were asserted by various governmental agencies for an allowed $1 billion subordinated claim, and certain additional allowed Claims to be satisfied from the Fire Victim Trust; (vi) the Case Resolution Contingency Process, which approved an agreement with the Governor's Office to address the circumstance in which the Plan was not confirmed or failed to go into effect in accordance with certain required dates, including the A.B. 1054 deadline; (vii) the Wildfire OII, which satisfactorily resolved the CPUC's pending investigation into the role the Utility's electrical facilities played in igniting wildfires in its service territory in 2017 and 2018; and (viii) the Plan OII, which culminated in the CPUC's final determination that the Plan fully complied with A.B. 1054.

As part of the Subrogation Claims RSA and the substantial reduction of Subrogation Wildfire Claims, the Debtors agreed to a condition in any plan or confirmation order requiring that any settlement or other agreement resolving a Fire Victim Claim would "include a release and waiver of any and all . . . potential made-whole claims against present and former holders of Subrogation Claims . . . ." *See* Subrogation Claims RSA § 3(a)(iii) (BR Dkt. No. 3992-1).[3] A release of the "made whole" claims for any Fire Victim Claim settlement or agreement with a Fire Victim Trust was an integral condition to the settlement of the Subrogation Wildfire Claims, and a critical reason why the holders of those claims were willing to settle at a substantial discount.

---

[3] "BR Dkt. No." references are to the Bankruptcy Court's docket, Case No. 19-30088 (DM) (Bankr. N.D. Cal.). "Dkt. No." references are to this Court's docket.

1    The Made Whole Release does not preclude Fire Victims from asserting other claims against their insurers, including the right to seek coverage for any remaining balance of their losses available under the policies. *See* Plan § 10.9(b). The form release in the Plan provides that "[b]y accepting the Total Allocation Award, the Claimant hereby waives and releases their rights, known or unknown, to assert the Made Whole Doctrine against the Insurer," Plan Ex. C ¶ 1, and it applies only to Fire Victims who voluntarily elect to settle the value of their claim with the Fire Victim Trust, Plan § 4.25(f)(ii). Without the Made Whole Release Provision, the Subrogation Claimants would not have reached a settlement with the Debtors. *See* Oct. 23, 2019 Hearing Tr. 193:15-19 (counsel for subrogation claimants: "One of the reasons that my clients are willing to compromise their claims at eleven billion dollars is so that they understand they get eleven billion dollars. They're not going to turn around and pay five of it back to these claimants."). The Debtors disclosed all of this information to Fire Victims well in advance of the Confirmation Hearing, pursuant to the Bankruptcy Court's Order dated March 17, 2020. BR Dkt. No. 6340. Even with the Made Whole Release Provision a condition to the Subrogation Settlement, the Plan received the overwhelming support of Fire Victims, with over 85% of Fire Victim ballots cast in favor of the Plan.

On July 1, 2020 ("Effective Date"), the Reorganized Debtors executed a number of transactions under the Plan, including making distributions to more than 2,800 creditors. *See* Declaration of John Boken (Dkt. No. 4-3, "Boken Decl.") ¶ 6. By the end of July 2020, the Reorganized Debtors made more than $42 billion in disbursements to creditors and other parties in interest, including funding the Fire Victim Trust established under the Plan with $5.4 billion in cash and 476,995,175 shares of Reorganized PG&E common stock, and funding the Subrogation Wildfire Trust established under the Plan with approximately $11 billion, paying approximately $1 billion in connection with the Public Entities Settlements, making payment of approximately $5 billion to the Go-Forward Wildfire Fund established under A.B. 1054, and making payments to noteholders and other holders of funded debt of over $15 billion and distributing new, replacement and reinstated notes aggregating over $21 billion. *Id.* Since the Effective Date, an additional 748,415 shares of common stock were issued to the Fire Victim Trust. *Id.* ¶ 7.

1    As a result of the shares transferred to the Fire Victim Trust, that trust held approximately
2    22% of the Reorganized Debtors' equity on the Effective Date. *Id*. The Reorganized Debtors also
3    issued on the Effective Date 423,372,629 shares of common stock and 16,000,000 equity units to
4    their underwriters in connection with the closing of the common stock and equity unit offerings to
5    fund the Plan. *Id*. In addition, 211,337,189 shares were issued to nearly 200 entities representing
6    Backstop Parties pursuant to the terms of the Backstop Commitment Letters and the Forward
7    Stock Purchase Contracts, and 342,105,261 shares of common stock were issued to other private
8    investors. *Id*. In total, the Reorganized Debtors issued approximately 1.5 billion new shares of
9    common stock—three times the Reorganized Debtors' previously existing shares. *Id*.

To fund the Plan and their operations, the Debtors raised approximately $9 billion in new value through the sale of over 800 million new shares and 16 million equity units, approximately $5.35 billion of which was sold in the public markets. *Id*. ¶ 8. In addition to their equity raise, and again based on the Confirmation Order, the Reorganized Debtors also raised nearly $11 billion by issuing several new debt securities to hundreds of new debt purchasers. *Id*. Many of the Reorganized Debtors' new securities are currently trading on the public debt and equity markets. *Id*.

## II.    LEGAL STANDARD

The Ninth Circuit has recognized that courts "will not entertain an appeal if the case is moot" on either Constitutional or equitable grounds. *In re Thorpe Insulation Co*., 677 F.3d 869, 880 (9th Cir. 2012). The doctrine of equitable mootness reflects a public policy valuing the finality of chapter 11 plan confirmation orders, and serves to protect the debtor, creditors, and third parties in bankruptcy cases. *Id*. This is because "[f]inality is essential to the success of bankruptcy reorganization plans," and "[b]oth creditors and the debtor require certainty so that the debtor can return to economic health, and the creditors can maximize their recovery within the debtor's ability to pay." *In re City of Stockton, California*, 909 F.3d 1256, 1263 (9th Cir. 2018).

In the Ninth Circuit, an appeal is equitably moot "if the case presents transactions that are so complex or difficult to unwind that debtors, creditors, and third parties are entitled to rely on the final bankruptcy court order." *In re Transwest Resort Properties, Inc*., 801 F.3d 1161, 1167

(9th Cir. 2015); *In re Mortgages Ltd.,* 771 F.3d 1211, 1215 (9th Cir. 2014). The Ninth Circuit considers four factors in determining whether an appeal is equitably moot:

> [1] We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. [2] If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. [3] Next, we will look to the effect a remedy may have on third parties not before the court. [4] Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

*Transwest Resort*, 801 F.3d at 1167–68.

### III.  DISCUSSION

#### A.  Appellants Did Not Seek a Stay

As a threshold matter, the Ninth Circuit requires that an appellant must "pursue with diligence all available remedies to obtain a stay of execution of the objectionable order." *Stockton*, 909 F.3d at 1264 (quoting *In re Roberts Farms, Inc.*, 652 F.2d 793, 798 (9th Cir. 1981)). Given that the debtor, creditors, and interested third parties need certainty to implement a confirmed plan, the Ninth Circuit has explained that "if a creditor wishes to challenge a reorganization plan on appeal, we require the creditor to seek a stay of proceedings before the bankruptcy court." *Stockton*, 909 F.3d at 1263.

Appellants, who are represented by counsel, do not dispute that they never attempted to seek a stay of the Confirmation Order, but claim that this factor does not favor dismissal because they are "filing a motion for [a stay of the Confirmation Order] under [Federal Rule of Bankruptcy Procedure 8007(a)(2)] concurrent with the filing of this opposition." Dkt. No. 8 ("Opp.") at 5.[4] But Bankruptcy Rule 8007 has no bearing on the Ninth Circuit's equitable mootness analysis, and the Ninth Circuit requires Appellants to "pursue with diligence all available remedies to obtain a stay of execution of the objectionable order." *City of Stockton*, 909 F.3d at 1264. Appellants failed to do so, and offer no reason for their delay. Appellants therefore allowed all other parties to "materially change[] positions in reliance on plan confirmation," *id.*, which is precisely the

---

[4] As the Debtors note, although Appellants contend they filed or would file a motion to stay concurrent with the opposition, there is no such filing on record with this Court.

harm the equitable mootness doctrine seeks to prevent.

Appellants' failure to diligently pursue a stay, compounded by their silence with respect to approval of the Subrogation Claims RSA, alone is sufficient reason for the Court to dismiss the appeal. *City of Stockton*, 909 F.3d at 1264 ("Failure to [seek a stay] without adequate explanation should result in dismissal.").

### B. The Debtors Have Substantially Consummated the Plan

Even if the Court were to consider the appeal in light of Appellants' failure to seek a stay pending appeal, the Court must look to whether the Plan has been substantially consummated. The Bankruptcy Code defines "substantial consummation" to mean: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." *See* 11 U.S.C. § 1101(2) (defining "substantial consummation"); *Mortgages*, 771 F.3d at 628 (applying section 1101(2) in finding that plan was substantially consummated); *Stockton*, 909 F.3d at 1264 (plan was substantially consummated where "[t]he City wired payment to institutional creditors, transferred property, and sent checks to former city employees to resolve pension claims, . . . conveyed title to numerous parcels of real property, assigned leasehold interests, and granted purchase options").

There is no question that the Debtors have substantially consummated the Plan, and Appellants do not appear to challenge substantial consummation. As noted, the Debtors have already (i) completed one of the largest capital raises in chapter 11 history, (ii) distributed billions of dollars to creditors and other parties in interest, (iii) funded the various trusts established under the Plan, including the Fire Victim Trust and Subrogation Wildfire Trust, (iv) distributed approximately 1.5 billion common shares to the Fire Victim Trust, the public, and others and raised billions through new debt and equity offerings, and (v) paid nearly $5 billion to the Go-Forward Wildfire Fund in compliance with A.B. 1054. Boken Decl. ¶¶ 6–8.

The Fire Victim Trustee and Subrogation Wildfire Trustee have been appointed and, pursuant to the Channeling Injunction, each of their respective trusts have assumed all liability for

7

the Fire Claims of their respective constituencies. *Id.* ¶ 9. The Fire Victim Trustee and claims administrator have commenced their review of the various Fire Victim Claims that were channeled to the Fire Victim Trust on the Effective Date to enable them to commence making timely distributions to Fire Victim Claimants. *Id.* The Reorganized Debtors have also executed the transfer of certain causes of action to the Fire Victims Trust that the Fire Victim Trustee may pursue for the benefit of Fire Victims. *Id.*

Therefore, under the plain language of the Bankruptcy Code and Ninth Circuit precedent, the Court finds that the Plan has been substantially consummated. *Stockton*, 909 F.3d at 1264.

### C. Harm and Prejudice to Third Parties

In considering whether the relief sought in an appeal "would bear unduly on innocent third parties," the Ninth Circuit considers whether it is possible to alter the plan "in a way that does not affect third party interests to such an extent that the change is inequitable." *Transwest Resort*, 801 F.3d at 1169 (quoting *Thorpe*, 677 F.3d at 882). The Ninth Circuit held that this factor weighed in favor of dismissal where "reversal of the Confirmation Order would undermine the settlements negotiated with the unions, pension plan participants and retirees, bond creditors, and capital market creditors, all of which were built into the reorganization plan." *Stockton*, 909 F.3d at 1264.

Appellants' only argument is that the Subrogation Claimants are not innocent third parties, and that if the Made Whole Release Provision is invalidated and the Fire Victim Claimants are not required to sign the release, "no other parties would be affected." Opp. at 7–8. That contention ignores that the Made Whole Release Provision was integral to the settlement embodied in the Subrogation Claims RSA, which was itself indispensable for the Debtors to confirm the Plan. Mot. at 12–13. The thousands of parties that voted to accept the Plan, received distributions in the form of cash, stock, or reinstated or replacement debt under the Plan, or agreed to purchase new debt or equity securities to allow the Debtors to fund the Plan and their operations all relied upon the terms of the Plan and these settlements, including the Subrogation Claims RSA and the Made Whole Release Provision.

Therefore, this appeal would undermine a critical and fundamental settlement built into the Plan, would be inequitable to the holders of Subrogation Claims and other claimants, shareholders,

8

1    and investors who relied on the settlement, the enforceability of the Confirmation Order, and the
2    innumerable transactions and distributions that were implemented in reliance.  Accordingly, the
3    Court finds there would be harm to third parties if the Court were to grant Appellants' requested
4    remedy.

### D.    The Court Cannot Fashion Effective and Equitable Relief

Finally, the Ninth Circuit has directed a reviewing court to dismiss an appeal as equitably moot where the relief requested "would create chaos and undo years of carefully negotiated settlements."  *See, e.g.*, *City of Stockton*, 909 F.3d at 1265.  Although Appellants contend that the Court could fashion relief without undermining the Plan because they are only "very narrowly objecting" to the Made Whole Release Provision, Opp. at 8, the clear practical effect is that this appeal would unravel integral provisions of the Plan.

As discussed, this appeal attacks a key provision of the Plan, the Made Whole Release Provision, and any meaningful relief on this appeal would require the Court to invalidate it.  This is also not a stand-alone provision; instead, it is an integral part of the settlement that substantially reduced the Subrogation Wildfire Claims to $11 billion.  Through the Subrogation Claims RSA, the Debtors settled $20 billion in asserted subrogation claims for approximately $11 billion.  The Subrogation Trust, paired with the Fire Victim Trust, was critical to allowing the Debtors to formulate and propose a plan that provided for the satisfaction of wildfire claims in compliance with A.B. 1054.  These were carefully-crafted, Bankruptcy Court approved settlements that enabled the Debtors to achieve a successful, largely consensual reorganization in full compliance with A.B. 1054.

The Plan could not "easily be modified," as Appellants suggest.  While Section 12.6 of the Plan contemplates that the Plan may be modified or amended in certain circumstances, that provision makes clear that any modifications or amendments shall be subject to the Subrogation Claimants' consent rights under the Subrogation RSA.  Plan § 12.6.  Further, the Plan provides that a modification or amendment shall not "materially and adversely affect the treatment of holders of Claims or Interests [t]hereunder."  *Id.*

Therefore, the Court could not modify the Plan to excise the Made Whole Release

Provision without altering the rights of the Subrogation Claimants, which would, in turn, materially and adversely affect the treatment of those claimants under the Plan and destroy the foundation of the settlement.  As the Bankruptcy Court was aware when it approved the Debtors' entry into the Subrogation RSA, the Subrogation Claimants were not willing to do a deal at $11 billion dollars, whether it be in cash, stock, or promissory notes, without the certainty that they were truly receiving $11 billion in value.  Dec. 4, 2019 Hr'g Tr. 129:18–131:8.  The Bankruptcy Court recognized that allowing "individual plaintiffs to go after their [insurer for made whole claims]" was "not going to work," and remarked that the Made Whole Release Provision was "a critical component to" to the Subrogation RSA.  *Id.* at 131:1-9.

Based on the Settlements, Confirmation Order, and Appellants' failure to seek a stay, billions of dollars were distributed to thousands of creditors, billions of dollars of new debt and equity financing was incurred, hundreds of millions of shares were issued and continue to trade, and a multitude of parties acted in reliance.  Under these circumstances, relief for the Appellants is neither equitable nor available.  These highly complex and interconnected transactions cannot be undone, and the Reorganized Debtors, creditors, and third parties are "entitled to rely on [the Confirmation Order]."  *Mortgages*, 771 F.3d at 1215.

## IV.   CONCLUSION

For the foregoing reasons, the Reorganized Debtors' Motion to Dismiss the appeal is **GRANTED**.  The Clerk is directed to terminate this appeal and close the case.

**IT IS SO ORDERED.**

Dated: 11/12/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge